NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MOHAMED BARRY,

Plaintiff,

v.

DEPORTATION OFFICER RODY ZAMAR, *et al.*,

Defendants.

Case No. 19-10216 (EP) (LDW)

**OPINION**

**PADIN, District Judge.**

Defendant United States Immigration and Customs Enforcement ("ICE") Senior Deportation Officer Rody Zamar ("ICE Officer Zamar") moves for summary judgment of Plaintiff Mohamed Barry's ("Barry") second amended complaint ("SAC") pursuant to Fed. R. Civ. P. 56. Barry asserts an excessive force claim against ICE Officer Zamar under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See* D.E. 22 ("SAC"). The Court decides this matter on the papers pursuant to Fed. R. Civ. P. 78 and L.Civ.R.78.1(b). For the reasons stated below, ICE Officer Zamar's motion for summary judgment is GRANTED. Moreover, because the claim against ICE Officer Zamar is the only claim now pending, Barry's SAC is DISMISSED with prejudice.

# I. BACKGROUND

## A. Factual Background

The Court begins with the summary judgment record.[1] In June 2017, Barry lived in a Newark apartment with Mamadou Barry ("Mamadou"), his brother, and George Kumi. D.E. 104-4 ("Barry's Dep.") at 17:17-18:2, 28:21-24; D.E. 104-2 ("Zamar's 56.1 Stmt.") ¶¶ 1-2. Barry became a naturalized United States citizen in 2011. Barry's Dep. at 21:12-13. He has been a taxi, Lyft, and Uber driver since at least 2017. *Id.* at 24:1-21.

On June 28, 2017, Mamadou was erroneously released from the United States Bureau of Prisons/Marshals Service's custody in the Eastern District of Philadelphia. D.E. 104-5 ("Zamar's Memo") at 1. Mamadou's release was erroneous because there was an active ICE detainer and an immigration administrative warrant for his return to ICE custody. *Id.*; D.E. 104-6 ("Zamar's Dep.") at 132:5-13. Mamadou also had "an extensive criminal history" that included "firearms, resisting arrest, eluding police and various types of fraud[.]" Zamar's Memo at 1; D.E. 111-7 ("Barry's Resp. to Zamar's 56.1 Stmt.") ¶¶ 5.1.

On June 29, 2017, ten members of the United States Marshals Regional Fugitive Task Force, District of New Jersey, ("Task Force"), including ICE Officer Zamar, arrived at Barry's Newark apartment to execute the immigration administrative warrant on Mamadou. Zamar's Memo at 1; Zamar's 56.1 Stmt. ¶¶ 3, 5. ICE Officer Zamar was the only member of the Task Force that was from ICE; most of the other Task Force members were from the United States Marshals Service ("Marshals"). Zamar's Memo at 1; Barry's Dep. at 41:22-42:2. The Task Force

---

[1] The Court notes that Barry's brief in support of his opposition to summary judgment contains no statement of facts. This practice is strongly discouraged, particularly in matters requiring significant fact sensitivity, because it obscures the factual support for a party's brief.

members all wore badges identifying their respective law enforcement agency—the only ICE badge belonging to ICE Officer Zamar. Barry's Dep. at 41:14-42:2.

Barry was in his apartment when the Task Force arrived. *See* Barry's Dep. at 31. Upon arrival, a member of the Task Force knocked on Barry's apartment door, stating "Police" and "open the door." Barry's Dep. at 31:21-32:15. Barry opened the door. *Id.* at 32:7-15.

The parties differ as to Barry's actions and demeanor after he opened the door. Barry's position: he stepped back because the Task Force members had machine guns pointed at him, D.E. 111-8 ("Barry's 56.1 Stmt.") ¶ 7; he asked "[w]hat happened?" *id.*; he told the Task Force members his name upon being asked, *id.*, and his identity was confirmed with his New Jersey driver's license and New York taxi license, *id.* at 9; he did not resist or attempt to flee because he had no reason to do so, *id.* at 7; he was attacked by the Task Force members, *id.*; he cried and begged for help, *id.*; he told the Task Force members that they were hurting him, *id.*; a Task Force member put his knee on Barry's neck, *id.* ¶¶ 8-9; another Task Force member put his knee on Barry's back, *id.* ¶ 8; and he was dragged down the stairs from his third-floor apartment, *id.* ¶ 9. As a result, the SAC alleges Barry sustained injuries to his head, chest, neck, and ribs. *See* SAC ¶¶ 28, 51. For the first time, Barry, in his brief, adds that he also sustained injuries to his feet, shin, and lower leg. *See* D.E. 111 ("Opp'n") at 11.

ICE Officer Zamar's position: prior to entering Barry's apartment, Task Force members were concerned for their safety after observing an individual looking out toward them from Barry's apartment, Zamar's 56.1 Stmt. ¶¶ 11-12; Barry became belligerent when he opened the door and saw machine guns pointed toward the door, *id.* ¶¶ 14-15; unlike the Marshals, he was carrying a pistol, not a machine gun, *id.* ¶ 10; Barry and a Task Force member engaged in an altercation, *id.* ¶ 16; Barry was brought to the ground after "catching hands" with another Task Force member,

*id.* ¶ 17; ICE Officer Zamar largely stayed behind the rest of the Task Force members to provide security, stood by the door, and entered the apartment last, *id.* ¶¶ 20-21; he perceived Barry as a threat to the Task Force members, *id.* ¶ 22; handcuffs were placed on Barry to control him and prevent him from causing any injuries to the Task Force members, *id.* ¶ 23; ICE Officer Zamar held Barry's legs and feet down to keep him from kicking and fighting the Task Force members while Barry was being handcuffed, *id.* ¶¶ 24-25; Barry struck ICE Officer Zamar in the head, and ICE Officer Zamar sustained a welt on his head and injuries to his forearm, *id.* ¶ 26; and Barry sustained injuries to his head, chest, neck, and ribs, not his legs, *id.* ¶¶ 27-28.

While the parties disagree on what exactly happened leading up to and while Barry was being handcuffed, as well as the extent of ICE Officer Zamar's involvement, it is undisputed that Barry sustained injuries to his head, chest, neck, and ribs during his interaction with the Task Force.

**B. Procedural History**

On April 17, 2019, Barry filed suit raising claims under 42 U.S.C. § 1983 against: Acting Deputy Director of the Marshals David Anderson; Acting United States Secretary of Homeland Security Kevin McAleenan; ICE Senior Deportation Officer Rody Zamar; and 14 unknown officers. *See* D.E. 1. On June 26, 2019, Barry filed his first amended complaint, which added Director of the Marshals Donald W. Washington as a defendant. *See* D.E. 4. The first amended complaint contained the same factual allegations as the original complaint. *Compare* D.E. 1 ¶¶ 1-68 *with* D.E. 4 ¶¶ 1-69.

Defendants Anderson, McAleenan, Washington, and Zamar ("Named Defendants") moved to dismiss Barry's first amended complaint on July 9, 2019. D.E. 8. On August 5, 2019, the Court entered the parties' proposed consent order in which the pending motion to dismiss would be

withdrawn without prejudice and Barry would be permitted to file a second amended complaint. D.E. 21.

On August 12, 2019, Barry filed his SAC, which replaced his Section 1983 claims with three *Bivens* claims. *Compare* D.E. 4 ¶¶ 70-77 *with* SAC ¶¶ 64-71. On September 17, 2019, Named Defendants moved to dismiss Barry's SAC. D.E. 26. On October 31, 2019, the Court entered the parties' proposed consent order, which dismissed the claims—Counts I and II—against Anderson, McAleenan, and Washington without prejudice. D.E. 33. This case then proceeded to discovery on the single remaining *Bivens* claim—Count III—against the single remaining defendant, ICE Officer Zamar only. D.E. 81 at 1.

On December 22, 2021, Barry moved for leave to amend his SAC, which attached a proposed third amended complaint ("TAC"). D.E. 76; D.E. 76-1. The TAC sought to add five additional individuals: Marshals Anthony Rossi, William Uhler, and Maggie Barone; Essex County Sheriff's Office Detective Leonard Jackson; and Postal Inspector George Henner. *See* D.E. 76-1. Aside from the additional defendants, the main difference between the SAC and TAC was that all of Barry's *Bivens* claims were reduced to one count against all of the defendants, rather than multiple counts. *Compare* SAC ¶¶ 64-71 *with* D.E. 76-1 ¶¶ 52-55. Named Defendants opposed Barry's motion. D.E. 79. On February 25, 2022, the Court denied Barry's motion for leave to amend his SAC because it was untimely, and Barry had not established good cause for the untimely amendment. *See* D.E. 81 at 2-4.

On May 27, 2022, the single remaining defendant in this case, ICE Officer Zamar, filed this motion for summary judgment. D.E. 104 ("Mot."). ICE Officer Zamar's motion includes,

*inter alia*, a statement of undisputed material facts pursuant to L.Civ.R.56.1,[2] Zamar's 56.1 Stmt., Barry's deposition, Barry's Dep., ICE Officer Zamar's deposition, D.E. 104-6 ("Zamar's Dep."), and a memorandum written by ICE Officer Zamar, Zamar's Memo. On July 5, 2022, Barry filed his opposition to the motion. *See* Opp'n. Barry's opposition attached, *inter alia*, a responsive statement of material facts citing to specific portions of the evidentiary record. *See* Barry's Resp. to Zamar's 56.1 Stmt.[3] Being fully briefed, the Court now decides ICE Officer Zamar's motion for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

The party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 136, 145-46 (3d Cir. 2004). The moving party must support its motion by citing to specific materials in the record. Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has adequately

[2] Under L.Civ.R.56.1(a), the moving party "furnish[es] a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion."

[3] Under L.Civ.R.56.1(a), the nonmoving party "furnish[es] a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion[.]"

supported its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). The nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson.*, 477 U.S. at 250. The nonmoving party "cannot create an issue of fact merely by [] denying averments [] without producing any support evidence of the denials." *Thimons v. PNC Bank,* NA, 254 F. App'x 896, 899 (3d Cir. 2007) (citation omitted). Where the nonmoving party's "evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50). But "[i]f reasonable minds could differ as to the import of the evidence," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250-51.

In reviewing a motion for summary judgment, the Court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marina v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then there is "no genuine issue as to any material fact[,]" and summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 322.

## III. DISCUSSION

ICE Officer Zamar advances three arguments in support of his motion for summary judgment: (1) Barry does not assert that ICE Officer Zamar did anything improper; (2) ICE Officer Zamar did not violate Barry's Fourth Amendment right against unreasonable search and seizure;

and (3) ICE Officer Zamar is entitled to qualified immunity. *See* Mot. at 8, 11, 13. The Court addresses each argument in turn.

**A. Material Facts are in Dispute as to ICE Officer Zamar's Involvement**

ICE Officer Zamar argues that he played no role in the alleged excessive force exercised against Barry. Mot. at 8. He adds that Barry has not come forward with any evidence establishing that ICE Officer Zamar used excessive force. *Id.* ICE Officer Zamar also emphasizes that the SAC does not allege any injuries to the area of Barry's body that ICE Officer Zamar contacted—Barry's feet, legs, and shins. *See* SAC ¶ 51. Barry responds that he has presented material disputed facts showing that ICE Officer Zamar was personally involved in the excessive force exercised against Barry, meaning that summary judgment would be inappropriate. Opp'n at 9.

The Fourth Amendment, which guarantees United States citizens the "right to be secure in their persons [] against unreasonable searches and seizures," protects citizens from the "unreasonable" use of force during the course of an arrest, investigatory stop, or any other seizure. *Graham v. Connor*, 490 U.S. 386, 395-97 (1989) (citing U.S. Const. amend. IV). Claims of excessive force are evaluated under the Fourth Amendment's "objective reasonableness" standard. *See Brosseau v. Haugen*, 543 U.S. 194, 197 (2004); *see also Graham*, 490 U.S. at 397 ("As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). The reasonableness of a particular use of force:

> must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight…Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and

> rapidly evolving – about the amount of force that is necessary in a particular situation.

*Graham*, 490 U.S. at 396-97 (internal citations and quotation marks omitted).

Here, the parties present contrasting accounts as to ICE Officer Zamar's actual level of involvement in the alleged excessive force exercised by the Task Force leading up to and while Barry was being handcuffed. This is relevant to the required "objective reasonableness" analysis.

ICE Officer Zamar claims that Barry's allegations arise from the actions of other Task Force members because the SAC only outlines injuries to Barry's head, chest, neck, and ribs, *see* SAC ¶¶ 28, 51, not his legs, shins, or feet. Mot. at 8. Barry's deposition similarly omits any mention of injuries to his legs, shins, or feet sustained when he was being handcuffed. *See generally* Barry's Dep. ICE Officer Zamar contends that this shows that he did not engage in any excessive force against Barry because his involvement was limited to holding down Barry's legs while other Task Force members attempted to restrain Barry. Mot. at 10.

While not particularly specific, Barry's response provides that ICE Officer Zamar's assistance in restraining Barry went beyond just holding his legs down while other Task Force members handcuffed him. Opp'n at 7, 9. In his response, and for the first time on the record, Barry claims that "he also sustained injuries to his feet, shin, and lower leg." *See id.* at 11. For support, Barry cites to four sentences contained in 100-plus pages of hospital records, which mention an abrasion to his left foot and shin. *See id.*; *see also* D.E. 111-3 at 29, 31, 32, 38. Finally, Barry also vaguely adds that ICE Officer Zamar "could have" caused the injuries to his head, chest, neck, and ribs. Opp'n at 11.

At the summary judgment stage, the Court must consider the evidence in the light most favorable to the nonmoving party. *See, e.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 768-69 (2014). With that standard in mind, the Court finds that Barry has raised a dispute as to two material facts.

First, Barry's position does sufficiently raise a dispute as to how involved ICE Officer Zamar was in the force used in handcuffing Barry. This is material because the SAC alleges, and the record supports, that Barry sustained severe injuries, including fractured ribs, when he was handcuffed. *See* SAC ¶ 51; D.E. 111-3 at 34, 37, 38. Second, the parties dispute Barry's level of cooperation with the Task Force leading up to Barry being handcuffed. Specifically, Barry contends that "he did not resist at all" and that "[h]e was not belligerent[,]" whereas ICE Officer Zamar argues the exact opposite. *Compare* Opp'n at 8-9 *with* Mot. at 12. This dispute is material because it colors whether the Task Force, including ICE Officer Zamar, exercised an "objectively reasonable" level of force in restraining Barry.

Accordingly, Barry has raised a dispute as to two material facts and ICE Officer Zamar is not entitled to summary judgment based on this argument. But because Barry's excessive force claim against ICE Officer Zamar is brought under *Bivens*, the Court must now determine whether Barry in fact has a viable *Bivens* claim.

**B. Barry Lacks a Viable *Bivens* Claim**

ICE Officer Zamar contends that he did not violate Barry's Fourth Amendment right against unreasonable search and seizure because "no reasonable jury could find that he engaged in excessive force." *See* Mot. at 11. Barry responds that the manner in which ICE Officer Zamar held his legs and assisted other Task Force members in handcuffing him amounted to excessive force in violation of the Fourth Amendment. *See* Opp'n at 9-12. But in reply, ICE Officer Zamar argues that a *Bivens* claim cannot lie in this case, especially after the Supreme Court's decision in *Egbert v. Boule*, 142 S. Ct. 1793 (2022). Barry in his sur-reply argues that *Egbert* does not

preclude recovery under *Bivens* because his claim is not an extension of *Bivens* and no special factors are present.[4] The Court disagrees with Barry and agrees with ICE Officer Zamar.

In *Bivens*, the Supreme Court recognized an implied private cause of action under the Fourth Amendment to recover damages against federal actors. 403 U.S. at 389, 395-97. Since *Bivens*, the Supreme Court has expanded the *Bivens* remedy to other constitutional violations only twice: under the Fifth Amendment's due process clause, *Davis v. Passman*, 442 U.S. 228 (1979), and under the Eighth Amendment's prohibition against cruel and unusual punishment, *Carlson v. Green*, 446 U.S. 14 (1986). *See Egbert*, 142 S. Ct. at 1797 (emphasizing that the Supreme Court has "declined 11 times to imply a similar cause of action for other alleged constitutional violations") (citations omitted).

Since *Bivens*, *Davis*, and *Carlson*, "the Supreme Court has cautioned on the separation of powers when courts expand *Bivens* causes of actions." *Marinaccio v. United States*, No. 21-11167, 2022 WL 2833960, at *15 (D.N.J. July 20, 2022) (citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (citation omitted)). The Supreme Court recently reiterated that "Congress is far more competent than the Judiciary to weigh such policy considerations…and the Judiciary's authority to do so at all is, at best, uncertain." *Egbert*, 142 S. Ct. at 1803 (citations and quotations omitted). In *Egbert*, the Court provided that "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, courts must refrain from creating [it.]" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1858).

The Supreme Court has provided a two-step analysis to determine whether a claim under *Bivens* may lie: (1) "[a] court asks first whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningfully different from the three cases in which the Court has implied a damages action[;]'

[4] On September 14, 2022, the Court gave Barry the opportunity to file a sur-reply to address the Supreme Court's decision in *Egbert v. Boule*. D.E. 118. Barry submitted a sur-reply on September 28, 2022. D.E. 119.

and [(2)] if so, do 'special factors' indicate that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* at 1797-98 (internal citation and quotation marks omitted). These two steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803.

Under step one of the analysis, the Court must determine whether Barry's claim presents a new *Bivens* context. "[A] new context arises when there are 'potential special factors that previous *Bivens* cases did not consider.'" *Id.* at 1803 (citation omitted); *see also Abbasi*, 137 S. Ct. at 1864 ("[E]ven a modest extension is still an extension."); *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) ("[The Supreme Court's] understanding of a 'new context' is broad."). A "meaningful difference" sufficient to support a finding that a case presents a "new context" can be as minor as, *inter alia*, "the statutory or other legal mandate under which the officer was operating" or simply a "new category of defendants."[5] *Abbasi*, 137 S. Ct. at 1857, 1860.

Here, the Court finds that there are at least two "meaningful differences" identified in *Abbasi* present in this case. First, "the statutory or other legal mandate under which the officer[s] [were] operating" is distinct. *See id.* at 1860. ICE Officer Zamar was not enforcing criminal law, unlike in *Bivens*, but rather was enforcing immigration law because the Task Force was executing an immigration administrative warrant. *See* Opp'n at 9 ("[T]he evidence is undisputed that the task force went to Plaintiff's apartment to execute an *administrative* warrant not a criminal warrant.") (citation omitted) (emphasis added); *Tun-Cos v. Perrotte*, 922 F.3d 514, 520-25 (4th Cir. 2019) (holding that a search and seizure claim presented a new context because it "concern[ed] ICE agents' enforcement of the INA, rather than traditional law enforcement officers' enforcement

---

[5] Such as "federal employer[s]," "military officers," "Social Security officials," a "federal agency," a "private prison operator," "officials from the Bureau of Land Management," and "prison guards at a private prison." *Id.* at 1857.

of the criminal law"). Second, this presents a "new category of defendant[]". *See id.* at 1857. ICE Officer Zamar qualifies as a new category of defendant because as an ICE agent he is charged with the enforcement of immigration laws, not criminal laws. Because there are "meaningful differences" between Barry's claim and the three Supreme Court cases that recognized *Bivens* liability, this case presents a new *Bivens* context.

Having found that Barry's claim presents a new *Bivens* context, the Court must next determine whether any special factors counsel hesitation in extending *Bivens*. While the Supreme Court has "not attempted to create an exhaustive list of factors that may provide a reason not to extend *Bivens*," it has explained that separation of powers principles are "central" to the analysis. *Hernandez*, 140 S. Ct. at 743. The Supreme Court has provided that the proper separation of powers inquiry is "whether there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate." *Egbert*, 142 S. Ct. at 1798 (citation and quotation marks omitted). "[E]ven a single sound reason to defer to Congress is enough to require a court to refrain from creating such a remedy." *Id.* at 1803 (citation and quotation marks omitted).

Here, the Court finds that separation of powers principles present a special factor counseling hesitation in extending *Bivens* to Barry's claim. Specifically, this case arises out of actions to an enforce an immigration law and Congress has a heavy hand in immigration enforcement. As the Fourth Circuit noted in *Tun-Cos v. Perrotte*, "Congress took steps to ensure that the protections it provided in the [Immigration and Nationality Act] would be exclusive of any additional judicial remedy." 922 F.3d at 526; *see also Nyanteng v. Thompson*, No. 21-10390, 2022 WL 2763552, at *17 (D.N.J. July 15, 2022) (declining to extend *Bivens* liability to ICE agent defendants after finding that "regulating the conduct of immigration agents [] risks intrusion into national security.").

Additionally, "Congress's legislative actions [related to immigration law] persuasively indicate that Congress did not want a money damages remedy against ICE agents for their allegedly wrongful conduct, as indicated by its frequent amendment of the [Immigration and Nationality Act] and its repeated refusal to provide a damages remedy." *Tun-Cos*, 922 F.3d at 527 (citing REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, 110 Stat. 3009-546; Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214; Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978; Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359; Act of Oct. 20, 1976, Pub. L. No. 94-571, 90 Stat. 2703; Act of Oct. 3, 1965, Pub. L. No. 89-236, 79 Stat. 911; *see also De La Paz v. Coy*, 786 F.3d 367, 377 (5th Cir. 2015) ("Despite its repeated and careful attention to immigration matters, Congress has declined to authorize damage remedies against individual agents involved in civil immigration enforcement. The institutional silence speaks volumes and counsels strongly against judicial usurpation of the legislative function")). Because separation of power principles present a special factor, the Court declines to open the door to *Bivens* liability to the present context.

For the reasons explained above, the Court concludes that Barry's SAC seeks to extend *Bivens* to a new context and that the application of *Bivens* to this new context counsels hesitation. Accordingly, no *Bivens* remedy is available here.

**C. ICE Officer Zamar is Entitled to Qualified Immunity**

Lastly, ICE Officer Zamar argues that he is entitled to qualified immunity, even if Barry could provide evidence that ICE Officer Zamar caused him physical injury, because "restraining a person's feet while he struggles to resist officers placing him in handcuffs does not violate a clearly established statutory or constitutional right of which ICE Officer Zamar could have

known." Mot. at 13-14. Barry responds that ICE Officer Zamar is not entitled to qualified immunity because the amount of force ICE Officer Zamar used violated Barry's Fourth Amendment right against unreasonable search and seizure. *See* Opp'n at 12-13.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ray v. Twp. of Warren*, 626 F.3d 170, 173 (3d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). If a "reasonable [official] is not on notice that his [] conduct under the circumstances is clearly unlawful, then application of qualified immunity is appropriate." *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 173-74 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The defendant bears the burden of proving he's entitled to qualified immunity. *See Thomas v. Independence Twp.*, 463 F.3d 285, 292 (3d Cir. 2006).

To determine whether a government official is entitled to qualified immunity, a court must examine: (1) whether the facts that the plaintiff alleges make out a violation of a constitutional right; and (2) if so, whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *See Pearson*, 555 U.S. at 232.

Because the Court has concluded that Barry does not have a viable *Bivens* claim against ICE Officer Zamar, the Court need not address whether ICE Officer Zamar is entitled to qualified immunity here.[6] *Bistrian v. Levi*, 912 F.3d 79, 96 n.25 (3d Cir. 2018) ("Because we conclude that

---

[6] If the Court were to address this issue, it is likely that ICE Officer Zamar would prevail because the record shows that he could have reasonably "believed the [challenged conduct] to be lawful, in light of clearly established law and the information [he] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Specifically, Zamar's Memo and his deposition clearly state that he believed Barry posed a danger to the Task Force members, given his actions ("caught hands" with at least one other Task Force member) and demeanor (described as "belligerent" by ICE Officer Zamar) at the time that the relevant events occurred.

[there is] not a recognized *Bivens* remedy, we again need not address whether any of the defendants are entitled to qualified immunity.”).

## IV. CONCLUSION

For the reasons stated herein, ICE Officer Zamar’s motion for summary judgment is GRANTED. Barry’s SAC is hereby DISMISSED with prejudice. An appropriate Order accompanies this Opinion.

Dated: October 3, 2022

Hon. Evelyn Padin, U.S.D.J.